STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. RE-00-8

The Elm Companies, Inc.,
    Plaintiff/Counterclaim Defendant


v.

Decision and Judgment


Timothy Beals et al.,
    Defendants/Counterclaim Plaintiffs

DONALD L. _____
LAW _____

OCT 20 2004

Hearing on the complaint and counterclaim was held on March 31 and April 1, 26 and 27, 2004. On each hearing date, the parties were present with counsel of record. Following the hearing, the parties submitted written argument, which the court has considered in conjunction with the evidence. The parties' claims arise out of a transaction under which The Elm Companies, Inc. (Elm) constructed a house in Mt. Desert for Timothy and Donna Beals (the Beals). Framed in several claims, Elm seeks recovery of approximately $26,000 from the Beals, which is the balance due, under the parties' construction contract, that the Beals have declined to pay. In their counterclaim, the Beals seek damages of nearly $40,000, which represents the amount of money they argue needs to be paid to correct deficiencies in Elm's work on the house (roughly $66,000), less the $26,000 that they have refused to pay Elm under the contract. Additionally, Elm and the Beals each seek an award of attorney's fees that is sometimes available under the statutory claims raised here.

I. Chronology and factual background

In 1998, the Beals were in the process of looking for a contractor to build them a new house on Mount Desert Island. They approached Jack Broughman, Elm's principal, and ultimately secured Elm to build them the house. The Beals chose to have Elm erect a building that, in its first floor and roof system, was constituted of manufactured modules.

1

This form of construction was attractive to the Beals because it was more economical and more quickly assembled than conventional construction methods. The interior of the second floor and the attached garage were stick built. Apex Homes, Inc., for whom Elm was a distributor, manufactured the modules. The Beals and Elm were both involved in the design for the residence. The parties to this action entered into a contract in July 1998. Under that contract, which was supplemented by change orders, the total price was roughly $215,000. Elm began construction on the house in October 1998. (Much of the site work had been done shortly after the parties signed the contract several months earlier.) By year's end, the construction project was substantially (but not fully) completed, and the Beals family had moved into the residence.

The parties dispute whether in 1999 the Beals had complained to Elm about any significant construction problems that were associated with Elm's work.[1] In late January 1999, the Beals sent Broughman a letter enumerating twenty particular claimed construction defects. *See* plaintiff's exhibit 2. In that letter, the Beals also wrote that they did not intend to "honor[]" the July 1998 contract. It appears that by then, the Beals had paid Elm all of the money required under the contract, save the amount that Elm seeks to recover in this action. Three days after the Beals sent the letter to Broughman, the three met to discuss the Beals' complaints, and Elm promptly began to work on a number of the problems. Some of the particular problems identified in the Beals letter are ones that they allege were not corrected, but many of those problems were resolved and cannot form the basis for relief here. Broughman and Timothy Beals had a followup meeting nearly a week after the first one, where they discussed the status of the problems.

In February, the Beals filed an administrative complaint with the Maine Manufactured Housing Board (MMHB). *See* plaintiff's exhibit 4. The Beals attached a copy of the January 22 letter they had sent to Broughman, using it as the description of the specific complaints they wanted the MMHB to pursue. Meanwhile, Elm continued to

---

[1] Broughman acknowledged at trial that the modular components for the Beals' house were more flawed than any other manufactured house he had used. Prior to the date when the Beals sent their January 1999 letter to Elm, the Beals had discussed with Broughman the possibility that they would seek relief from Apex, and in fact they encouraged Broughman to join them in that action. Broughman declined. Nonetheless, the parties to this action do not dispute the notion that, under the contract and Maine law, Elm is responsible for any defects in the materials provided by Apex.

2

work on the house and, in particular, to address the Beals' specific complaints. An inspection was conducted on behalf of the MMHB in April. That report is not in evidence, and its author, Robert Gore, did not testify at trial. Nonetheless, the evidence reveals that Gore's report was provided to Elm. Then, in June 1999, Patrick Ouillette, an engineer who works as a housing inspector for the MMHB, inspected the Beals' house. Ouillette noted that two of the problems noted by Gore (leaks around the bilco door to the basement, and a problem with a beam in the attic) had not been addressed successfully, although Elm had tried to fix the bilco door problem. Ouellette also observed some rippling in the exterior vinyl siding and several bulges in the exterior walls, although the Beals had not complained of these matters, which Ouellette felt had developed "over time." *See* plaintiff's exhibit 8. Elm then addressed these matters as well.

By August, Broughman reported to Ouillette that he felt that he had cured the problems and invited him (Ouillette) to re-inspect the house to ensure that the work had been done. It does not appear that Ouillette accepted this invitation, perhaps because around that time, Timothy Beals advised Ouillette that that he (Beals) no longer wished to pursue the administrative course, deferring to the prospects of a court action. The MMHB therefore put this matter on "inactive" status. After Elm felt that it had addressed the problems that had been identified in the administrative process, Broughman told Timothy Beals to advise him (Broughman) if there were any further problems. Broughman heard nothing from Beals or from the MMHB, although Broughman was unaware that the Beals had curtailed the administrative process.

The Beals still had not paid Elm the $26,000 that is the subject of this action. In order to preserve its statutory rights to perfect a mechanic's lien, in October Elm filed a lien certificate with the Hancock County Registry of Deeds. *See* plaintiff's exhibit 11; *see generally* 10 M.R.S.A. § 3253 (time limits for perfection of mechanic's lien). Through its counsel, Elm notified the Beals of this action. Broughman also made demand for payment under the Construction Contract Payment Act, 10 M.R.S.A. § 1111 *et seq.* In that letter, Broughman advised the Beals that, in his view, Elm had completed all of its work on the house except for the installation of a window to replace one that was defective (the replacement window had not yet arrived). Broughman wrote that he was willing to await $500 payment for the window but felt that the Beals were obligated to

3

pay Elm the remainder of the balance owed under the contract. *See* plaintiff's exhibit 12. Hearing nothing further from the Beals, Elm then commenced this action against the Beals in late December 1999. *See* 10 M.R.S.A. § 3255 (limitations for actions to enforce mechanic's lien). In late February 2000, the Beals filed their responsive pleading, which included a multi-count counterclaim based on allegations that Elm's construction of their house was defective. The Beals also filed suit against Apex (CV-00-40). That case ultimately was dismissed.

Despite the Beals' request in late summer 1999 that the MMHB not take any further action because the Beals wished to pursue any claims in court, in early 2001 Timothy Beals contacted Patrick Ouillette and asked him to reactivate the administrative proceeding. As part of the renewed process, Ouillette conducted another inspection of the Beals home in March 2001. That inspection revealed a number of problems that went beyond those that Ouillette noted during his inspections of the house in 1999. *See* plaintiff's exhibit 13. Several of the problems noted by Ouillette in 2001 overlap with the complaints set out in the Beals' original letter written in January 1999. The Beals' complaint was scheduled for an adjudicatory hearing before the MMHB several weeks after Ouillette visited the Beals house in March 2001. Prior to the hearing, however, Elm entered into a consent agreement with the MMHB. (The Beals were not parties to the administrative action and therefore were not signatories to the written agreement.) *See* plaintiff's exhibit 14. Under the terms of that agreement, Elm acknowledged the defects set out in the report arising from Ouillette's March 2001 inspection. *See id.* at ¶¶ 12-13. Elm also agreed that it had violated warranties at law by failing to install the manufactured components of the house in accordance with Apex' instruction and by failing to correct the defects noted in the Ouillette report. *See id.* at ¶ 11. The consent decree essentially recited that these flaws constituted violations of the Manufactured Housing Warranties Act, 10 M.R.S.A. § 1401 *et seq. See* plaintiff's exhibit 13 at ¶¶ 6-7, 11-13.

The consent agreement also sets out the remedial steps that Elm was then required to take. No later than the August 7, 2001, Elm was to correct several specific problems identified in the report that Ouillette prepared after his March 2001 inspection, as well as three other issues described in the consent agreement itself. *See* plaintiff's exhibit 13 at ¶

4

14(b). Additionally, one of the issues addressed by the MMHB was a pattern of roof problems, where ridges became visible. A third-party engineering firm was charged with determining the cause of this problem. Then, by August 7, 2001, Elm was required to correct the problems in the roof structure pursuant to the inspection conducted by the engineering concern, subject to Ouillette's oversight. *See id.* at ¶ 14(a). Elm was to bear all costs associated with all of these repairs.

Prior to the conference that resulted in the issuance of the consent agreement, Broughman had learned that the Beals had asked Anthony Sousa, an engineer with whom the Beals were acquainted, to inspect the house. Sousa had done so in September 2000. Although the Beals were not parties to the MMHB proceedings, they were present for the scheduled hearing in April 2001. Prior to that meeting, Broughman, the Beals and perhaps others met preliminarily to discuss the situation. During that meeting, Broughman proposed to use Sousa's report – sight unseen -- as the basis for establishing what work was still needed, to designate Sousa as the arbiter of whether that work would be completed, and to pay Sousa for his involvement. The Beals rejected that proposal.

In late May, after some delays attributable to the Beals, Ouillette and the outside engineer inspected the Beals house as provided in the consent agreement. Then, in early June, Elm and Apex returned to the Beal house and performed work required by that agreement. Ouillette was present at least some of the time when that remedial work was performed. This work revealed that the cause of the ridgelines in the roof was that the sheathing under the shingles was not fastened properly to the roof rafters. The roof problems that were evident in 2001 were cured, and Ouillette was satisfied that the condition had not caused any lasting damage. Ouillette was also satisfied with the overall level of Elm's response after the consent agreement was executed.

Ouillette conducted a final inspection of the house in October 2001. *See* plaintiff's exhibit 16. The court finds that Ouillette's October 2001 inspection was thorough. This finding is based on Ouillette's own testimony that because that inspection was a prelude to the submission of his final report, he conducted a close inspection. Additionally, the court finds that assessment to be a reasonable one. The matter had been pending before the Board for several years, and it reached the point where the MMHB and Elm had entered into a consent agreement. That agreement assigned Elm

5

responsibility to make specific repairs, and under the terms of the agreement, Elm's professional license would be in jeopardy if it fell short of compliance. Ouillette's October 2001 inspection covered those matters that were addressed in the April 2001 consent agreement. Ouillette found that three of those problems had not been fully remediated. One (a crack in the drywall) was minor, and Elm had addressed the other two but had not completely corrected them. In January 2002, Donna Beals advised Ouillette that Elm had done further work on those items and, on her attorney's advice, would no longer permit Elm onto the premises. Although Beals did not explain to Ouillette whether the work had been done to her satisfaction, Ouillette concluded that Elm had done the work required by the consent agreement. When this circumstance was combined with the Beals' intention to exclude Elm from the premises, Ouillette concluded that there was no point in a further inspection, and the agency closed its files on the matter. The Board has had no further involvement in this case, and, because of the Beals actions, Elm has not performed any additional work on the house, although, as Broughman testified, Elm stands ready to honor the warranty obligations created in the parties' construction contract.

## II. Construction defects

Beginning in January 1999, the Beals (either themselves or through their representatives) have identified a number of defects in the materials and labor associated with the construction of their house. Not all of the problems are found in the initial complaints; rather, some were identified later in the process. Further, many of those problems have been addressed to the Beals' satisfaction and are not longer a basis for relief here.[2] The framework for the Beals' presentation is the report and accompanying testimony of Dan Norwood, who is a building contractor on Mount Desert Island. Norwood inspected the house at Sousa's request in early 2001, and he revisited the

---

[2] In addition to the fact that a number of the complaints about the house have been resolved, the nature of the Beals' remedies is limited. Initially, Donna Beals had sought relief for emotional distress and other non-pecuniary losses that she claimed were caused by the quality of Elm's work on the house. The court dismissed this category of claims for the reasons set out in the July 11, 2003, order. In their presentations in the courtroom and in their written argument, the Beals make clear that they seek damages for the actual cost of repairs they argue are needed because of the remaining problems with the house.

premises earlier this year. Of the 24 problems itemized by Norwood, seven are no longer at issue.[3] The remaining defects alleged by the Beals are addressed here.

## A. Ventilation in basement

The building specifications provided by Apex provided for 20 square feet of ventilation openings in the basement. *See* defendants' exhibit 30, "drawing no. 5." As Sousa testified, the industry standard, as applied to the Beals' house, calls for at least severn square feet. In fact, the amount of open ventilation in the Beals' house is three square feet because the foundation walls were poured onto ledge. Nonetheless, despite the limitations on the placement of windows or other forms of ventilation, Elm modified Apex' design requirements without the approval of Apex or the consent of the Beals. There is no gross evidence of damage caused by excessive humidity in the basement. Nonetheless, the area sometimes is damp.

This is not an issue that was covered in Ouillette's inspections because the MMHB proceedings consisted of an investigation into violations of statutory warranties. The amount of ventilation in the basement is governed by the written contract between Elm and the Beals, and thus, because it is not a warranty issue, it is not something that would fall within the scope of the administrative action.

Broughman testified that the Beals did not complain about this issue. However, Elm was on notice of the ventilation requirement, because that requirement derived from the Apex construction plans. Thus, no complaint was necessary. On this and other defects claimed by the Beals, Elm also argues that it should be allowed to perform under the warranty obligations it owes to the Beals and perform any necessary repairs, rather than to face exposure to money damages for a breach. Elm also argues that the Beals have waived any claim for recovery due to defects in the construction, because they have declined Elm's open-ended offer to repair any remaining problems. These arguments do not carry weight in instances where Elm failed to do the required work in the first place. Similarly, where Elm unsuccessfully attempted to fix problems that were the subject of complaints, its argument is weakened because it has already had the opportunity to

---

[3] These include the basement post (Norwood item 1), leaking windows (Norwood item 2), bulges in locations were the modules were not aligned properly (Norwood item 13), a missing exterior vent (Norwood item 14), missing garage door seals (Norwood item 17), damaged sheetrock (Norwood item 18), and a cracked dormer rafter (Norwood item 20).

discharge its responsibilities under the warranties at issue. Thus, in this instance, where Elm simply did not provide for the ventilation that was required under the plans, the Beals would be entitled to recover the costs that they would be required to pay someone else to obtain the benefit of the contractual provision that Elm had agreed to provide.

The court infers from Norwood's testimony that some provision can be made to provide adequate ventilation in the basement. This will cost $2,000.

## B. Insulation under first floor

As with the basement ventilation requirement, the Apex plans called for insulation under the first floor (that is, in the basement ceiling). *See* defendant's exhibit 30, "drawing 7" and "drawing 7.3." Elm did not insulate that area, thus depriving the Beals of this element of their house to which they are contractually entitled. This is also an issue not within the parameters of the MMHB investigation, and its omission from Ouillette's report is therefore not meaningful.

The cost to insulate the first floor is $1,295.

## C. Roof

As is noted above, ridges in the roof system to the house occasionally appeared. This was not one of the problems that the Beals noted in their January 1999 letter or that Ouillette reported after the first inspection he conducted of the house, in June 1999. However, the problem was apparent at least by the time that Norwood first examined the house in 2001, and it may have been evident when Sousa inspected the building in September 2000. At those times, the cause of the problem was unknown, and it was a matter that was specifically addressed in the consent agreement executed in 2001. Those provisions are discussed above. Pursuant to the consent agreement, the roof shingles were removed to allow a diagnosis of the roof problem. As a result of this process, it was learned that the sheathing under the shingles had not been secured adequately to the roof support system. Edges of the sheathing became elevated, creating the ridges. In order to cure the problem, Elm fastened the sheathing to the rafters, and shingles were replaced. This solved the problem as of the times Ouillette conducted his inspections of the house

8

following the issuance of the consent agreement.[4] As Ouillette testified, the loose sheathing did not cause any lasting damage to the structure.

Norwood testified that it would cost $5,050 to fix the roof problem. At the time he formulated that estimate, however, he did not know the cause of the problem. The cause subsequently was revealed. This development weakens the weight to which the estimate is entitled, because now that the source of the problem is known, the court infers that any such remaining problems can be addressed directly rather than wait until preliminary work is done to determine the reasons for the problem.

There remains the more basic issue of whether this problem still exists. By mid-2001, the ridges had been eliminated. At trial, Donna Beals testified that several ridge lines have redeveloped since the completion of Elm's 2001 repair work. Even if this is the case, the amount of repair expenses has not been established on this record. Norwood's estimate is based on the condition of the roof prior to the 2001 repairs. The court declines to conclude that any work that might be needed now is identical to the work that was required prior to those repairs, because the present condition is not the same as the one from 2000. Further, as is noted above, the nature of any present work would be different, because the cause of any ongoing problem is now known. Therefore, even if the Beals have established an ongoing problem with this aspect of the roof, they have not demonstrated the cost to resolve any such problem, and they are not entitled to any reduction of their contractual obligation to Elm on account of this issue.

### D. Siding

During the course of the construction and remediation process, there had been ongoing problems with the vinyl siding on the building. This problem apparently first developed between January 1999 (when the Beals wrote the letter of complaint to Elm, but made no reference to any problem with the exterior siding) and June 1999 (when Ouillette conducted his first inspection of the house and observed that the siding in several areas showed "significant rippling" and was loose and bowed, *see* plaintiff's

---

[4] Following Norwood's approach, the court has attempted to distinguish the problem as determined in 2001, from a separate but similar problem in which a ridge appeared where the folded modular roof sections were not properly aligned during installation. This latter issue is addressed in section L below. Further, the problem discussed herein is different from problems affecting the garage roof, addressed in section K of this order.

exhibit 8). He observed the same type of problem in early spring 2001, shortly prior to the proceeding that generated the consent agreement. As he noted in his report from the 1999 inspection, Ouillette felt that these problems with the siding were within the jurisdiction of the MMHB. *Id.* This has significance, because when Ouillette followed the course of Elm's repair work following the issuance of the consent agreement in 2001 and when he inspected the house several times in 2001, he knew of the siding problem and was attentive to it. Although there is evidence to the contrary, the court places greatest weight on Ouillette's testimony that the defects in Elm's application of the vinyl siding, that clearly had been problematic earlier, had been successfully addressed. Particularly in light of his affirmative testimony that he inspected all problem areas of the siding and has approved the remedial work, the court accepts the evidence that Elm's repair work ultimately resulted in a proper application of the siding to the house and that there are no material problems of mismatched colors. Thus, the Beals have not established that they are entitled to any relief on this point.

In one of Ouillette's June 2001 visits to the Beals' house, he did note some loose siding on the garage. He did not report this as an issue of concern to the MMHB, because the garage is not a matter within the Board's authority. Even if this problem was not corrected, the Beals have not presented evidence that would allow an assessment of repair costs for this limited issue. Rather, their claim relating to the siding is predicated on the removal and replacement of all of the siding on the house and garage.

### E. Fascia trim

Several problems affected the fascia. First, a section of the trim was bowed out. This was caused by a roof rafter that simply was too long, pushing out the trim under edge of the roof. As a second problem, the surface of the fascia sometimes ripples. This is the unavoidable consequence of the nature of this element of the house. The exterior of the fascia is composed on aluminum, and the metal is attached to the wood underneath. Because they are different materials, they behave differently in the environment. In the heat, for example (either when the ambient temperature is hot or when the sun shines on the fascia), the wood and aluminum expand at different rates and to different degrees, causing the rippling.

10

As with the problems discussed previously, the fascia issue was not the subject of complaint by the Beals in January 1999 but rather was noticed later on, no later than March 2001 when Ouillette inspected the house shortly prior to the scheduled MMHB hearing. And as with the problems with the siding, in Ouillette's view the problems with the fascia were matters within the authority of the Board. Therefore, his assessment of the problem and of repair efforts is worthy of particular weight because they are matters to which he paid attention.

The evidence reveals that despite Elm's attempts to remove the outward bow from the fascia, the problem was not adequately cured. When Elm was engaged in the roof repairs following the issuance of the consent agreement in April 2001, it removed enough of the roof to reveal that the bow in the fascia was caused by a roof rafter of excessive length. Elm then cut the length of the offending rafter. This reduced the magnitude of the bow but did not eliminate it fully, as Ouillette noted when he conducted his final inspection of the Beals house in October 2001. *See* plaintiff's exhibit 16. From the best available evidence, the court finds that this remains a problem.

The court reaches the contrary conclusion regarding the rippling of the surface of the fascia. For the reasons noted above, the combination of materials constituting the fascia trim in the Beals house make this phenomenon unavoidable to some extent, unlike, for example, a fascia made of painted wood. There is no evidence that the mere use of an aluminum-wood fascia is improper or below acceptable standards. Indeed, Norwood has proposed to remove the existing fascia and install a new one that is constructed similarly but with different materials. Thus, it is necessary to accept some level of tolerance for rippling. The court here cannot conclude that the improvement in the appearance of the fascia resulting from Elm's 2001 repair work, as noted by Ouillette and also recognized by Norwood, still falls short of an acceptable tolerance.

Norwood projected a cost of $7,500 to remove the existing fascia and replace it with new trim. This estimate does not allocate the cost of repairs that would be prompted only by the outward bow. Rather, it assumes proof of both aspects of the fascia problem, and only one has been established here. Thus, the court is left to speculate about the costs to repair only the bow. The damage estimate is also affected by Norwood's proposal to install fascia of a higher grade than Elm had installed under the contract.

11

Norwood was unable to meaningfully state the cost for fascia of the same quality as Elm provided. Thus, for these two reasons, the Beals have not proven the amount of any damages they have sustained due to the outward bow in the fascia.

In addition to the problem with the fascia on the house, the trim on the garage (again, a matter not addressed in the MMHB proceeding) needs work, as even Elm's expert agreed. This will cost $635, and the Beals are entitled to have this amount considered in support of their counterclaim.

### F. Windows and doors

From the testimony of several witness (the most comprehensive of which was Sousa's), the court finds that this issue includes: a garage window that is out of square; two casement windows in the second floor of the house that do not work properly; the front door that leaked; and a rear and garage doors that do not close properly.

There is a gap above the garage window, which still needs to be fixed. There is no evidence of water infiltration, but the mere fact that the window is not tight establishes the defect. Elm's efforts to fix the crank mechanism on the casement windows were unsuccessful. The front door leaks because of a design defect: because it opens inward, water can leak in. The best remedy will be the installation of a storm door. Finally, the other two doors are still problematic: they do not close properly and cannot be locked. Elm had actual or constructive notice of most of these problems, and the court concludes that the Beals are entitled to an accommodation for the cost of repairing these problems, which is $7,500.

### G. Vapor barrier

Norwood testified that a vapor barrier should be installed behind the knee walls, which the court infers are located on the second floor of the house. He derives this recommendation from an inspection conducted early on in this process, by Robert Gore, Gore did not testify at trial, and any reports he issued were not admitted into evidence. Nonetheless, Norwood and Ouillette made reference to his work. The Beals do not point, however, to the source of any obligation – whether it arise from the parties' contract, a warranty imposed by law, or industry standards – to include a vapor barrier in that particular application. The contract required Elm to install Tyvek house wrap. However, the knee wall is an interior wall, whereas the evidence suggests that Tyvek is applied to

the outside of the exterior side and roof sheathing. Thus, the contract does not appear to call for the vapor barrier on the knee walls. Further, although it is customary to secure a vapor barrier to exterior walls, and although the photographs show that a vapor barrier was used for much of the Beals' house, the evidence does not demonstrate the surface area of the knee walls or other circumstances that would persuasively show that its absence is a material defect in the construction of the house. Finally, there is no evidence that the absence of a vapor barrier has caused or will cause damage.[5] Thus, the omission of this material cannot be regarded as a basis for relief.

### H. Bilco doors

The bilco door, providing access to the cellar space, apparently was sprung during the construction process. As a result, it was not seated properly and allowed air and water infiltration. Elm was advised of this issue in the Beals' initial letter, and Ouillette noted the problem as well. The court accepts Ouillette's assessment in 1999 that the door needed to be replaced. As of March 2001, when Norwood conducted his inspection, that had not been done. This repair job did not make it onto Ouillette's March 26, 2001, list, which became the focus of Elm's repair work. From this sequence, the court concludes that the bilco door was never replaced. The Beals are entitled to an offset of the cost for this work, $500.

### I. Octagonal window

Pursuant to the design, Elm installed an octagonal window that could be opened. From the start, the window became a chronic source of water leaks, which damaged both the insulation in adjacent sections of the wall and the wallboard itself. Elm replaced the window with a similar one before learning that operating octagonal windows, by their nature, do not work well because the seal is not effective. Elm then secured the window so that it was fixed to the wall and could not be opened. When Ouillette conducted his March 2001 inspection, the disabled operating window needed to be replaced with a fixed

---

[5] The evidence includes several photographs of a water stain on the knee wall. However, this appears to be the result of some isolated problem other than the absence of a vapor barrier, which would be a more widespread problem. Also, Donna Beals testified that presently there are no water or moisture problems affecting the house. The court takes this as affirmative evidence that the absence of a vapor barrier in the knee wall is not creating any problem.

13

window. Ouillette's final report makes no reference to the condition of the window. However, at trial, Ouillette testified that when he conducted that final inspection in October 2001, he understood that the window was going to be replaced. During that process, he expected that the damage to the wallboard would be fixed anyway and that any damage to the wall insulation could be detected and cured. From this, the court concludes that the window still needs replacement, and work will need to be done on the surrounding wall. The best evidence of the associated repair costs, derived from Norwood's testimony, is $2,500.

### J. Garage support truss

A number of the garage roof trusses are not properly supported, because one end of those trusses appears ultimately to rest on a non-structural element of the garage. There is little dispute in this record that a new header or some other support system is required. This will cost $500.

### K. Garage roof irregularities

When Norwood first inspected the building in March 2001, he observed some problems with the application of the shingles and with the ridge vent. Elms' expert, Daniel McGraw agreed with this assessment. Subsequently, as Norwood himself described, Elm made some repairs to the area but did not completely fix the ridge vent. Norwood's repair estimate of $200 appears to contemplate work to the shingles and the ridge vent. Because the work on the shingles has been completed, the court is willing to infer that the cost for the remaining work will be $100.

### L. Misalignment of roof hinge area

When the modules of the Beals home were being transported to the construction site, sections of the roof were folded along a hinge. When Norwood first inspected the house, he saw that shingles along the fold line were not properly seated and in fact were bulging. In order to repair this problem, shingles would be removed, and the underlying sheathing could then be realigned. On Norwood's most recent inspection, he observed that most of the misalignment had been repaired and that only an 8 foot seam needed attention. Norwood's only cost estimate, for $4,000, was for all of the repairs that he first felt were needed. However, much of the needed repair work has already been completed. Unlike the allocation of repair costs associated with the garage roof discussed in section

14

K of this order, the court declines to speculate about the cost that would be incurred to finish this task. Norwood himself stated that he has not formulated this lower estimate. Further, this issue is more significant than the more limited work on the garage roof, and the remaining work is similar to the work already done. Therefore, even if there still remains a visible misalignment of roof sections (an allegation that is in dispute), the Beals have failed to prove the cost for any remaining repair work.

### M. Roof sheathing

A panel of roof sheathing has a 4 inch hole that may have been caused by a forklift. Although noted by Ouillette during his March 2001 inspection, Elm failed to address the problem. Ouillette did not make note that this problem remained uncured when he conducted his final inspection in October 2001. However, Broughman testified that he was unaware of the issue (despite reference to it in Ouillette's March 2001 report, which put Elm on at least constructive notice of this problem). From this, the court finds that the problem remains. It may not have structural implications, and to date water has not penetrated the area because the exterior of the roof panels are covered with a water barrier. Nonetheless, the court agrees with Norwood's assessment that the panel should be replaced. This will cost $1,250. (Sousa stated that it might be possible to patch the hole. However, the record does not suggest the cost for this work.)

### N. Kitchen floor

As a result of some adjustments that Elm made to the support under the kitchen floor, that floor was rendered uneven. The Beals identified this as a problem in their January 1999 letter to Elm, and it remained a problem when the consent agreement was issued in 2001. As of that latter date, the middle of the kitchen floor was 1/4 inch lower than the perimeter. On Norwood's subsequent visit to the house, he concluded that Elm had improved the situation, although in his view, the problem had not been fully corrected.

From this evidence, the court cannot find that the sag in the floor is of sufficient magnitude to constitute a material defect. Even prior to the 2001 repairs performed by Elm, the variance within the floor level was not substantial. Elm's remedial work in 2001 then reduced that minor sag even more. When Ouillette inspected the house again in the fall of 2001, he was satisfied with the outcome, and Norwood acknowledged some

15

improvement. Consequently, the Beals have not established that they are entitled to relief or accommodation on the basis of this issue.

### O. Den floor

The floor in the second floor den has a 1.5 inch hump in the middle. The problem originated with a broken floor truss in the module Elm acquired from Apex. After several efforts, Elm fixed the truss. This decreased but did not eliminate the hump. Elm then applied a compound to the floor, which, in effect, raised the lower sections of the floor so the entire area is even. Although Broughman felt that this procedure adequately addressed the problem, all of the experts agree that more work is needed. There also is little disagreement that the additional work will cost roughly $1,250.

### P. Driveway grade

The grade of the driveway near the garage was inadequate, particularly during the winter, to allow water to flow away from the structure. The contact did not require Elm to provide a finish grade for the driveway, although Elm was to put in a roadway, which could be seen to include the dooryard. Regardless of the Elm's ultimate responsibility for the quality of the driveway work, the court concludes that the obligation of a reasonably workmanlike performance required Elm to ensure at least a rough grade with sufficient positive drainage to direct water away from the garage. Elm's own expert effectively testified that this was part of Elm's obligation to the Beals. That did not happen here, even though in their January 1999 letter, the Beals advised Elm that water and snow were flowing into the garage. This issue was presented in the context of problems with the installation of the garage doors, but the complaint nonetheless was sufficient to put Elm on notice of the drainage problem. It will cost $1,500 to provide proper grading.

### Q. Interior painting

The Beals allege that all of the rooms on the first floor of the house, some of the second floor rooms, and some window trim need to be repainted. Norwood testified that this work is needed because of repair work that either had been done or needs to be done on interior wall areas and windows. Norwood calculated that the cost for this work would be $14,000. Based on the evidence identifying the areas that the Beals contend need this work, and from the cost that Norwood projects, it is evident that the Beals view this alleged defect as substantial.

16

Particularly when this aspect of the Beals' claim is viewed in this way, it is not supported by the evidence. In January 1999, the Beals advised Elm of cracks and other defects in the surface of interior walls. When Ouillette inspected the house two years later, he made particular note of wall cracks in one area of the house, another area where the seam between sections of wallboard was noticeable, and one ceiling (in the kitchen) that needed to be replaced. That Ouillette included these problems in his assessment is significant, because it demonstrates that he viewed them as matters of concern to the MMHB, and they are matters that were of interest to him during follow-up inspections as he monitored Elm's repair work. As of October 2001, Ouillette make observations about the condition of the walls, and he saw only one area that, in his view, needed additional work: a crack in the drywall that was caused by repairs to a nearby doorway. Ouillette characterized this issue as "minor," and the court agrees. In 2002, Elm's expert found a crack, and from his description of the nature of the problem and its location in the house, the court concludes that he identified the same problem that Ouillette noted in his final inspection. The cost for this repair is $145.

Norwood's testimony on this point is weakened because he is not aware of the extent of Elm's contractual responsibility for painting. In fact, under the contract, Elm was required to apply two primer coats to the walls. The court gleans from Norwood's testimony that he would impose a greater burden on Elm.

The court recognizes the disputed nature of this claim. However, the weight of evidence simply does not bear out much of the Beals' contention.

**R. Summary**

The Beals have refused to pay Elm $26,040 that is due under the contract. For the reasons noted above, the Beals have established that the cost to repair various defects and other shortcomings in Elm's construction of their house would be $19,175. The cost of such repairs is one of the proper measures of damage for defective construction, *see* *VanVoorhees v. Dodge*, 679 A.2d 1077, 1081 (Me. 1996), and it is the one the Beals pursue here. This means that under the terms of the contract, the Beals are liable to Elm in the net amount of $6,865.

### III. Statutory claims

#### A. Elm's claims

One of Elm's claims against the Beals is to enforce the mechanic's lien it recorded in 1999. For the reasons set out above, the court determines that the amount of Elm's lien is $6,865. At this time, the court issues no order of sale. If the judgment entered on this liability is not satisfied within 60 days of the date this judgment becomes final, Elm may file a post-judgment motion for order of sale. *See Twin City Development Corp. v. Ross*, 522 A.2d 901, 901-02 (Me. 1987).[6]

Elm also seeks to invoke the remedies found in 10 M.R.S.A. § 1111 *et seq.* Elm argues that the Beals' refusal to make payments in the manner required by the contract violates those statutory provisions. The parties agree that the Beals withheld payment of roughly $26,000. Section 1118 authorizes a homeowner to withhold payments "in an amount equaling the value of any good faith claims against an invoicing contractor,. . .including claims arising from unsatisfactory job progress, [or] defective construction or materials. . . ." *Id.*, § 1118(1). An amount is not wrongfully withheld "if it bears a reasonable relation to the value of any claim held in good faith by the owner. . .against which an invoicing contractor. . .is seeking to recover payment." *Id.*, § 1118(3). Elm contends that the amounts withheld by the Beals fall outside of the retainage allowed by this provision.

Although the court has concluded that the Beals withheld an amount that in fact was greater than the amount of any damages they sustained as a result of defective aspects of Elm's performance, they had good faith claims in excess of that difference. Although the court has rejected a number of their specific complaints, their case was supported by competent professionals who had inspected their house. The court has noted the reasons it did not accept a number of the Beals' factual contentions. Nonetheless, those contentions were largely legitimate – certainly to a degree that, when framed quantitatively, would rise to the level of the amount they withheld. Additionally, it is important to note that when the Elm commenced this action, Elm had not yet

---

[6] As is evident from the terms of the disposition noted in the text, the court intends the adjudications of the parties' claims as set out in this order to constitute a final judgment within the meaning of M.R.Civ.P. 54.

18

performed a number of the repairs that were completed while this lawsuit has been pending. Rather, Elm conducted significant remedial work in 2001, after Elm entered into the consent agreement with the MMHB. Thus, the extent of the defects in the house was materially greater in late 1999, when Elm filed its complaint, than is the case now.[7] Thus, when Elm asserted that the Beals wrongfully withheld money it claimed was due under the contract, the Beals were warranted in a withholding a greater sum than the present circumstances would allow.

For these reasons, Elm has not established that the Beals are liable for the statutory remedies created in 10 M.R.S.A. § 1111 *et seq.*

## B. The Beals' claims

In their counterclaim against Elm, the Beals have included causes of action under the Home Construction Contracts Act (HCCA), *see* 10 M.R.S.A. § 1486 *et seq.*, and the Manufactured Housing Warranties Act (MHWA), *see* 10 M.R.S.A. § 1401 *et seq.,*. Section 1406 of the MHWA implicates the Unfair Trade Practices Act (UTPA), *see* 5 M.R.S.A. § 205-A, and the Beals seek the imposition of remedies available under the UTPA.

First, although the Beals have alleged in their pleadings that the contract used by Elm in this project did not satisfy the requirements of the HCCA, they have not made any meaningful argument in support of such a claim. Even if the absence of such an argument, the evidence does not provide a basis for relief under this statute. The HCCA does not set out any independent forms of relief. Rather, a violation of the HCCA is prima facie evidence of a UTPA violation, *see* 10 M.R.S.A. § 1490(1), and the only forms of relief that are available to the defendant are those set out in the UTPA.[8] "In order to recover damages for a violation of the UTPA the homeowner must show a loss of money or property that results from the violation." *William Mushero, Inc. v. Hull*, 667

---

[7] In this context, it bears note that much of the Beals' photographic evidence (still photos and a videotape) was created in 1999, although some of the photographs were taken in 2000 and 2001.

[8] The HCCA itself allows the imposition of civil penalties. 10 M.R.S.A. § 1490. However, the court declines to make any such award here because the Beals have not urged the court to do so and because the Beals have not presented any argument that the contract was defective in the first place.

A.2d 853, 855 (Me. 1995) (applying provisions of HCCA to UTPA); *see also* 5 M.R.S.A. § 213. Here, the Beals have not proven that any violation of the HCCA caused them to lose money or property. They have established that aspects of the construction work performed by Elm were defective. However, their claim of damage consists of the reduction in the value of the house as constructed, compared to the value it should have had if it were free of material defects. This loss of value could constitute a loss of money or property within the meaning of the UTPA. However, as was their right under 10 M.R.S.A. § 1118, the Beals chose to withhold final payment that was due to Elm under the construction contract. And as it turned out, they withheld an amount that exceeded the amount of the damages they claim.[9] Thus, the Beals have not lost money or property, because they have received a house that has a greater value than the amount of consideration they have paid to date. Consequently, even without addressing the question of whether Elm's conduct violated the provisions of the UTPA, the court concludes that the Beals are not entitled to any damages that would flow statutorily from such a violation. Because the UTPA provides the remedies for violations of the HCCA, this also means that the HCCA itself – even if Elm violated those provisions – cannot independently form the basis for an award to the Beals.

The Beals also argue that Elm violated two provisions of the MHWA: the statutory warranty that the manufactured home[10] is substantially free of defects in materials and workmanship (section 1404); and the statutory warranty that the installation of a manufactured house is free from substantial defects in materials and workmanship (section 1404-A). Although Elm argues that it has not violated these statutes, it is bound by its acknowledgement, made part of the consent agreement, that it committed both types of violations. *See* plaintiff's exhibit 14, ¶¶ 12 and 13. A violation of the MHWA "shall constitute a violation of. . .[the] Unfair Trade Practices Act." 10 M.R.S.A. §

---

[9] Except for an amount less than $100, they have not spent any of this retainage on repairs.

[10] The provisions of section 1404, by their own terms, apply to mobile homes. The Beals' house, of course, is not a mobile home. However, section 1403 makes section 1404 applicable to manufactured homes, which includes the Beals'.

20

1406.[11] Nonetheless, even when a respondent engages in an unfair trade practice, an aggrieved party is entitled to the UTPA remedies only if the violation results in loss of money or property. *See* 5 M.R.S.A. § 213; *VanVoorhees*, 679 A.2d at 1082. For the reasons noted above, the Beals have not established this point. Therefore, even if they have established the procedural predicate for recovery of statutory remedies as required by section 213(1-A), they have not proven that they have lost money or property as the result of Elm's conduct.

The entry shall be:

For the foregoing reasons, judgment on the complaint is entered for the plaintiff in the amount of $6,865, plus prejudgment interest at the annual rate of 8%, *see* 14 M.R.S.A. §1602-B(7)(A), and post-judgment interest at the annual rate of 7.41%, *see* 14 M.R.S.A. § 1602-C. If the defendants fail to satisfy this judgment within 60 days of the date this judgment becomes final, Elm may file a post-judgment motion for order of sale pursuant to 10 M.R.S.A. § 3251 *et seq.* The judgment entered herein is a final judgment pursuant to M.R.Civ.P. 54.

On the counterclaim, judgment is entered for the counterclaim defendant (the plaintiff).

Except as is expressly provided in this judgment, the parties' requests for attorney's fees and other statutory remedies are denied.

The plaintiff is awarded its costs of court.

Dated: August 27, 2004

_____
Justice, Maine Superior Court

**FILED &
ENTERED**

AUG 3 0 2004

**SUPERIOR COURT
HANCOCK COUNTY**

---

[11] By contrast, a violation of the HCCA is "prima facie evidence" of a UTPA violation. 10 M.R.S.A. § 1490(1).

21